IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BANNER - UNIVERSITY MEDICAL CENTER SOUTH**<br>655 East River Road<br>Tucson, AZ  85704<br><br>**UNIVERSITY MEDICAL CENTER**<br>1501 North Campbell Avenue<br>Tucson, AZ  85724<br><br>             Plaintiffs,<br><br>      v.<br><br>**ROBERT F. KENNEDY, JR.,** In his Capacity as<br>Secretary of the U.S. Department<br>of Health and Human Services<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201<br><br>             Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT FOR JUDICIAL REVIEW OF ADVERSE AGENCY DECISION
ON MEDICARE REIMBURSEMENT**

## JURISDICTION AND VENUE

1. This is a civil action brought to obtain judicial review of a final decision rendered on April 21, 2025 by the Provider Reimbursement Review Board ("PRRB" or "Board"), acting as a component of the United States Department of Health and Human Services ("HHS"), which decision denied expedited judicial review (EJR) for the plaintiff hospitals (hereinafter "Plaintiffs" or "Hospitals"), and to vacate regulations promulgated by the Secretary of HHS, and to reverse certain determinations made by the PRRB on Medicare appeals filed by Plaintiff Hospitals. That appeal filed was identified by the PRRB as follows: Appeal No. 16-0992GC (FYE 2013). This Court has jurisdiction under 42 U.S.C. §1395oo(f), 28 U.S.C. 1331, and 28 U.S.C. § 1361. This civil action is filed within sixty (60) days of the date the Hospitals are deemed to have received the decision of the PRRB denying their requests for EJR.

2. Venue lies in this judicial district pursuant to 42 U.S.C. §1395oo(f), and 28 U.S.C. § 1391(e).

## PARTIES

3. The plaintiff Hospitals, their Medicare Provider Numbers and fiscal years appealed are below:

   | | | | |
   |---|---|---|---|
   | 1) | BANNER – UNIVERSITY MEDICAL CENTER SOUTH | 03-0111 | 2013 |
   | 2) | UNIVERSITY MEDICAL CENTER | 03-0064 | 2013 |

4. Defendant Robert F. Kennedy, Jr., Secretary of the Department of Health and Human Services, 200 Independence Avenue, S.W., Washington D.C. 20201, is the federal officer responsible for the administration of the Medicare program. Defendant Kennedy is sued in his official category.

## MEDICARE STATUTORY AND REGULATORY BACKGROUND

5. The Medicare program was established to provide health insurance to the age and disabled. 42 U.S.C. §§1395-1395cc. The Centers for Medicare & Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA), is the operating component of the Department of Health and Human Services (HHS) charged with administering the Medicare program.

6. Medicare reimburses the operating costs of short-term acute care hospital inpatient services primarily through the hospital Inpatient Prospective Payment System (IPPS). 42 U.S.C. §1395ww(d). The IPPS statute contains a number of provisions that adjust reimbursements based on Provider-specific factors. *See* 42 U.S.C. §1395ww(d)(5). This case involves the Provider-specific disproportionate share hospital (DSH) adjustment, which requires the Secretary to provide increased IPPS reimbursement to providers that serve a "significantly disproportionate number of low-income patients." 42 U.S.C. § 1395ww(d)(5)(F)(i)(I).

7. Whether a Provider qualifies for the DSH adjustment, and how large an adjustment it receives, depends on the Provider's "disproportionate patient percentage" (DPP). 42 U.S.C. § 1395ww(d)(5)(F)(v). The DPP is the sum of two fractions, the so-called "Medicare Fraction" and Medicaid Fraction," for a Provider's fiscal period. 42 U.S.C. §1395ww(d)(5)(F)(vi). Providers whose DSH percentages meet certain thresholds receive an adjustment which results in increased IPPS payments for inpatient hospital services. 42 U.S.C. §1395ww(d)(5)(F)(ii).

8. The first Fraction's numerator is the number of a provider's inpatient days for such period who (for such days) were entitled to both Medicare Part A and Supplemental Security Income (SSI) benefits, and the denominator is the number of patient days for patients entitled to Medicare Part A. 42 U.S.C. § 1395ww(d)(5)(F)((vi)(I). This case involves this first fraction, which is hereinafter referred to as the SSI fraction, or the Medicare Fraction.

COMPLAINT FOR JUDICIAL REVIEW OF ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

9. The second fraction's numerator is the number of Provider patient days for patients who (for such days) were eligible for medical assistance under a State Plan approved under Title 19 of the Social Security Act, 42 U.S.C. §1396-1 et seq., for such period but not entitled to benefits under Medicare Part A, and the denominator is the total number of the Provider's inpatient days for such period. *Id*. The second fraction is frequently referred to as the Medicaid Fraction.

10. The DSH program was enacted by Congress in the Consolidated Omnibus Budget Reconciliation Act of 1985 and was made effective beginning with discharges on or after May 1, 1986. Pub. L. No. 99-272, § 9105, 100 Stat. 158-60 (Apr. 7, 1986).

11. The Secretary implemented the DSH program through the publication of an interim final rule on May 6, 1986. 51 *Fed. Reg.* 16,772 (May 6, 1986). In the May 6, 1986 final rule, the Secretary decreed that only Medicare beneficiaries who are "recipients" of SSI, i.e., only those Medicare beneficiaries who have actually received payment, in a given month will have their inpatient hospital stay days counted in the numerator of the Medicare Fraction for that month. *Id.* at 16,777. In the August 16, 2010 final rule, the Secretary maintained that "our policy has always been to include only Medicare beneficiaries who are entitled to receive SSI benefits in the numerator of the SSI fraction." 75 *Fed. Reg*. 50042, at 50280 n.19 (Aug. 16, 2010). The Secretary's policy is that only Medicare beneficiaries who are paid SSO cash benefits for a given month are, "entitled to receive SSI benefits" for purposes of including the inpatient days associated with such beneficiaries in the numerator of the SSI fraction (a/k/a Medicare Fraction). The Secretary does not consider beneficiaries who received non-cash SSI benefits for a particular month to be, "entitled to receive SSI benefits." And as explained below, the Secretary's policy is to omit the inpatient days of certain Medicare beneficiaries who; (1) were entitled to be paid SSI for the month(s) of their hospital stay; and (2) at the time of a data match between SSA and CMS, were known by SSA to be entitled to

SSI payment for such month(s), but, (3) had not actually received payment for such month(s) by the time the data match was performed.

12. The SSI program is administered by the Social Security Administration (SSA); therefore, identifying patients who were entitled to SSI during their hospitalization requires access to SSA's SSI data.

13. To enable CMS to calculate the SSI Fraction, SSA sends CMS an annual "eligibility file" that includes information on all SSI recipients whom SSA has coded with one of three payment status codes: C01 (current pay), M01 (forced pay), and M02 (forced due). Although SSA has dozens of payment status codes, CMS's policy is that only C01, M01, and M02 indicate SSI entitlement for purposes of the numerator of the SSI Fraction. *See* 75 *Fed. Reg*. at 50,042, 50,280 (Aug. 16, 2010). Therefore, at CMS' request or direction, only those individuals with one of the three above-referenced payment status codes are listed on the "eligibility file."

14. SSA does not include payment status codes in the SSI eligibility file but does include monthly indicators denoting which month(s) each person received SSI payments. *See id.* at 50,276; *see also* 51 *Fed. Reg.* 31,454, 31,459 (Sept. 3, 1986) (stating that the SSI file "lists all SSI recipients for a 3-year period and denotes the months during that period in which the recipient was eligible for SSI benefits").

15. CMS then computes the SSI fraction by matching individuals appearing in the SSA's eligibility file with its own Medicare inpatient data to identify a patient's entitlement to SSI benefits. *Pomona Valley Hosp. Med. Ctr. v. Azar*, No. CV 18-2763 (ABJ), 2020 WL 5816486, at *2 (D.D.C. Sept. 30, 2020) (citing 75 *Fed. Reg.* at 50,281). In other words, "CMS identifies the individuals appearing in both two data sets to determine the number of patients, and the inpatient days for those patients at each hospital, for the applicable fiscal year to calculate the hospital's SSI numerator." *Id*.

16. The data match between SSA and CMS for any given Federal fiscal year is conducted approximately 15 months after the end of that fiscal year. If, at the time the data match is performed, a Medicare beneficiary was paid SSI cash benefits for a month covered by the data match, any inpatient hospital days associated with such beneficiary will be counted in the numerator of the Medicare Fraction. For example, if a Medicare beneficiary is an inpatient in Hospital (a Medicare certified short-term acute care hospital) from April 29 -May 6, 2022 and, by the time the SSA eligibility file is constructed for that year, was paid SSI for April but not for May, the days April 29 -30 would be counted in the numerator of the Medicare Fraction, and the days May 1 -6 would not be counted.

17. After the SSA-CMS data match is performed, CMS does not make adjustments to the Medicare Fraction based upon subsequent, retroactive corrections to the eligibility status of a Medicare beneficiary. Thus, for example, if the Medicare beneficiary filed an application for SSI based on disability on January 1, 2023 and had an inpatient stay in July, 2023, but was not, at the time of her stay, adjudicated eligible for SSI, that Medicare beneficiary would not appear on the SSA eligibility tape, and thus the days associated with her July, 2023 stay would not be counted in the numerator of Hospital's Medicare Fraction. Moreover, if six months after the data match for Fiscal Year 2023 was performed, that Medicare beneficiary was awarded SSI based on disability *retroactive* to January 1, 2023, the days associated with that Medicare beneficiary's July, 2023 stay nevertheless would *not* be added to the numerator of Hospital's Medicare Fraction. In this example, at the time the data match was performed, neither SSA nor CMS knew that the Medicare beneficiary would subsequently be awarded SSI based upon disability.

18. However, in contrast to the example given in the previous paragraph, there are situations in which; (a) a Medicare beneficiary does not receive SSI payment for a particular month, (b) is entitled

to SSI payment for that month, and, at the time of the data match, is known by SSA to be so entitled, but, (c) inpatient days associated with such individual nevertheless are not counted. For example, if, for a given month, an individual does not have a bank account or is considered by SSA to need a representative payee, but no payee has yet been designated or, SSA does not have a valid address for such an individual, SSA will not make payment to that individual for that month. If the administrative reason for not making payment is not resolved by the time the SSI eligibility file is constructed, the inpatient days associated with such a beneficiary will not be included in the numerator of the Medicare Fraction because CMS requests or directs SSA to include only individuals with payment status codes C01, M01, or M02.

19. SSA's Programs Operating Manual System (POMS) is sub regulatory guidance published by and used by SSA to implement the SSI program. Section SI 02301.201 of the POMS is entitled "Description of SSI Post Eligibility (PE) Events." It states in the Introduction portion that "[t]he term 'eligible' in this subchapter means that a recipient meets all eligibility requirements for part or all of a past or current month(s)." Section SI 02301.201B.2. is entitled "Stop Payment." It explains that "[a] stop payment is an interruption in payment. It is not a loss of eligibility. Payments may be reinstated for past or current month(s) on a stop pay record regardless of the period in nonpay." Section SI 02301.201B.2. specifically mentions the situation in which an SSI eligible individual needs a representative payee, but the SSA field office has not appointed one as a "stop payment."

20. Under the Secretary's policy, not all individuals who are entitled to SSI have their inpatient days included in the Medicare Fraction during the month(s) of their hospital stay, either because they are entitled to SSI but were not entitled to SSI cash payments during such month(s) or were entitled to SSI cash payments but were not paid SSI cash payments for such month(s).

21. CMS' payment and audit functions under the Medicare program are contracted out to insurance companies known as Medicare Administrative Contractors (hereinafter, the "MAC"). MACs determine payment amounts due to the providers under Medicare law and regulations. 42 U.S.C. § 1395h, 42 C.F.R. §§413.20(b) and 413.24(b). Although the MAC calculates the DPP, CMS computes the SSI fraction.

22. At the close of its fiscal year, a provider must submit a cost report to the MAC showing the costs it incurred during the fiscal year and the portion of those costs to be allocated to Medicare. 42 C.F.R. §413.20. The MAC reviews the cost report, determines the total amount of Medicare reimbursement due the provider and issues the provider a Notice of Program Reimbursement (NPR). 42 C.F.R. §405.1803.

## REQUIREMENTS FOR OBTAINING BOARD JURISDICTION

23. A provider or group of providers dissatisfied with the MAC's NPR(s) may obtain a hearing before the Provider Reimbursement Review Board (PRRB) or (Board) if it requests such a hearing within 180 days of the issuance of the NPR, and the amount in controversy is satisfied. 42 U.S.C. § 1395oo(a); 42 C.F.R. §405.1835(a);   There is also an amount in controversy requirement, which is $10,000 or more for a single provider appeal, and $50,000 or more for a group appeal.  42 U.S.C. § 1395oo(b); 42 C.F.R. §405.1837(b).

## REQUIREMENTS FOR GROUP APPEALS

24. The Medicare Statute provides that certain appeals may or must be brought as a group appeal. Specifically, the Statute provides that;

> The provisions of subsection (a) [with regard to single provider appeals] shall apply to any group of providers of services if each provider of services in such group would, upon the filing of an appeal (but without regard to the $10,000 limitation), be entitled to such a hearing, but only if the matters in controversy involve a common question of fact or interpretation of law or regulations and the amount in controversy is, in the aggregate, $50,000 or more.

42 U.S.C. § 1395oo(b). With regard to so-called common interest – related providers (CIRP) appeals, the Statute states that;

> Any appeal to the Board or action for judicial review by providers which are under common ownership or control, or which have obtained a hearing under subsection (b) must be brought by such providers as a group with respect to any matter involving an issue common to such providers.

42 U.S.C. § 1395oo(f)(1).

25. The Statute's use of the word "matters" (plural) in 42 U.S.C. § 1395oo(b) means that Congress allows a group appeal to involve more than one issue. Contrary to Statute the regulations, and PRRB Rule 12.2 requires group appeals to contain a single "matter" (singular) and thus are contrary to the Statute and invalid.

26. The Statute allows for such a group appeal if there is "a common question of fact or interpretation of law or regulations" – the Statute does not require that there be only one common question of fact or interpretation of law or regulations. Contrary to the Statute, the regulations and the PRRB Rules require, for both optional and mandatory (CIRP) group appeals that there must be a "single question of fact or interpretation of law, regulations, or CMS Rulings that is common to each provider in the group." 42 C.F.R. §1837(a)(2); PRRB Rule 12.2.

27. In the 2008 final rule promulgating section 405.1837, 73 *Fed. Reg.* 30, 190 (May 23, 2008) (2008 Final Rule), the Secretary stated that "[o]ur proposals for group appeals were made with the view that, to the extent we have discretion under the statute, we should allow appeals to be brought as group appeals so as to reduce the workload on the Board, as well as the burden on providers and intermediaries." 73 *Fed. Reg.* at 30,209. However, the Secretary incorrectly read the statutory language "a common question of fact or interpretation of law or regulations" to mean "a single common question of fact or interpretation of law or regulations." *See id.* at 30,212 ("The statute

requires that a group appeal involve only a common question (singular) of fact or interpretation of law or regulations. The regulations at § 405.1837(a)(2) further specify that a group appeal involve a single question of fact or interpretation of law, regulations, or CMS Rulings that is common to each provider in the group."). Ostensibly, Congress had the same goal as the Secretary, namely, that a group appeal would be a more efficient process than separate provider appeals in reducing the Board's backlog and would reduce the financial and administrative burden on providers and Medicare contractors. Yet, the Secretary did not attempt to explain why Congress would have wanted to force a group of say, 100 providers, that all have seven issues in common, to bring seven different group appeals.

28. The regulations permit a provider to obtain expedited judicial review on more than one legal issue in the same appeal. *See* 42 C.F.R. §405.1842(a)(2) ("Each EJR decision by the Board must include a specific jurisdictional finding on the matter**(s)** at issue, and, where the Board determines that it does have jurisdiction on the matter**(s)** at issue, a separate determination of the Board's authority to decide the legal question**(s)**; §405.1842(b)(2) ("A provider or group of providers may request the Board to grant EJR of a specific matter or matters under appeal, or the Board on its own motion may consider whether to grant EJR of a specific matter or matters under appeal"). The Secretary does not explain in the 2008 Final Rule or elsewhere why he interprets the statutory language pertaining to EJR, i.e., "**a** question of law or regulations relevant to the matters in controversy" and "**the** question of law or regulations relevant to the matters in controversy," *see* 42 U.S.C. § 1395oo(f)(1), as permitting multiple questions or legal issues in a request for expedited judicial review EJR), while at the same time claiming that the statutory language pertaining to group appeals, i.e., **a** common question of fact or interpretation of law or regulations," *must* be read as requiring that a group appeal may contain only a *single* question or legal issue. Nor has the Secretary offered any reason why Congress would have

wanted to limit EJR petitions that challenge multiple regulations to be limited to single provider appeals.

29.   In addition, to wrongfully prohibiting providers from prosecuting group appeals with more than one "issue," the PRRB also takes an impermissibly expansive approach as to what constitutes separate issues. The regulations at 42 C.F.R. § 405.1835 contain requirements for appealing an "issue" and a time limit on adding an "issue" – not on "sub-issues" or "components" of an issue.

30.   In this case, each of the six groups appealed a single issue, namely the calculation of the Medicare Fraction component of the DSH DPP. The Hospitals have multiple reasons why they believe their Medicare Fractions were calculated incorrectly, but that does not change the fact that a single adjustment and a single legal issue are involved.

## REQUIREMENTS FOR OBTAINING EXPEDITED JUDICIAL REVIEW

31.   The Medicare Statute provides that a provider or a group of providers may obtain expedited judicial review (EJR) if the provider or group;

> may obtain a hearing under subsection (a) and has filed a request for such a hearing, such provider may file a request for a determination by the Board of its authority to decide the question of law or regulations relevant to the matters in controversy (accompanied by such documents and materials as the Board shall require for purposes of rendering such determination). The Board shall render such determination in writing within thirty days after the Board receives the request and such accompanying documents and materials, and the determination shall be considered a final decision and not subject to review by the Secretary. If the Board fails to render such determination within such period, the provider may bring a civil action (within sixty days of the end of such period) with respect to the matter in controversy contained in such request for a hearing.

42 U.S.C. § 1395oo(f)(1). Similarly, the regulations provide that a provider has the right to seek EJR of a legal question relevant to a specific matter at issue in a Board appeal if there is Board jurisdiction to conduct a hearing on the matter . . . and the Board determines it lacks the authority to decide the legal question. . . ." 42 C.F.R. §405.1842(a)(1),  42 U.S.C. § 1395oo(f)(1).

32. The PRRB's determination that the Hospitals did not file a complete EJR request is factually and legally incorrect.

33. The Medicare Statute also provides that the PRRB may consider and grant EJR on its own motion. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. §405.1842(c). In granting the PRRB the authority to grant EJR on its own motion, Congress expects the PRRB to exercise its discretion in a reasonable manner. The failure of the PRRB to grant EJR on its own motion, under the facts and circumstances of this case was a gross abuse of the PRRB's discretion.

## SPECIFIC FACTS PERTAINING TO THIS CASE

34. On March 25, 2025, Quality Reimbursement Services, Inc. (QRS), as the appointed representative for the Hospitals that are the Plaintiffs in this civil action, sought EJR on behalf of the Hospitals <u>on the issue of whether regulation 42 C.F.R. §412.106(b)(1) is invalid by requiring a patient to be due a payment for Supplemental Security Income (SSI) for the months he or she has an inpatient stay in order for the days of such stay to be included in the numerator of the Medicare Fraction for purposes of the Disproportionate Payment Percentage of the Disproportionate Share Hospital (DSH) add-on component of Medicare Inpatient Prospective Payment System (IPPS).</u> *See* section 1886(d)(5)(F)(vi)(I)and (II). (and *see,* **Exhibit "A"**).

35. The gravamen of the Group Appeal concerns and hence describes in greater detail the Statement of Issue set forth within the Group Appeal's Position Paper to the effect that the Board's assigned MAC failed to follow the provisions of the Medicare Act in calculating each Hospital's PPA (Provider Percentage Adjustment) which ultimately determines the increase, if any of additional DSH reimbursement to the Hospital. Moreover, each Plaintiff made clear that the specific regulations under appeal are (1) 42 C.F.R. §412.106(b)(2)(i), which after the FY 2005 IPPS final rule, limited the Medicare Fraction to "covered" patient days; (2) 42 C.F.R. §412.106(b)(2)(i)(B), by which CMS

includes in the Medicare Fraction days "furnished to patients who during that month were entitled to both Medicare Part A (including Medicare Advantage (Part C)) and SSI, excluding those patients who received only State supplementation"; and (3) directions issued by CMS to the MACs for calculating the Providers' Disproportionate Patient Percentage for the costs years at issue by including non-covered (total) days. QRS asserts that the Hospitals challenged (1) the FY 2005 final rule as being procedurally and substantively invalid with respect to Part C days, exhausted days and MSP days; (2) section 412.106(b)(2)(i)(B) as being arbitrary and capricious for being internally inconsistent and not making a principled basis for including non-covered (total) **Medicare** days in the denominator of the Medicare Fraction but including only paid SSI days in the numerator of the Medicare Fraction; and (3) the directions given by CMS to the MACs, which followed the D.C. Circuit's decision in *Allina Health Servs. v. Sebelius*, 746 F.3d 1102 (D.C. Cir. 2014), as being an invalid substantive rule because it has substantive effect but did not go through notice and comment rulemaking procedures. QRS further asserts that because all three of these rules, either singly or in combination, affect the amount of DSH reimbursement claimed by the Hospital, and because the Board did not have the authority to invalidate any of them, it was appropriate for the Board to grant EJR.

36. In the EJR Determination Letter issued by the Board to Plaintiffs dated April 21, 2025 (*see,* **Exhibit B**) the Board issued its denial for Expedited Judicial Review.

37. Regulation 42 C.F.R. 405.1837(f)(2)(ii) provides that "[w]hen the appeal is found to involve more than one factual or legal question common to each provider, the Board *must* assign a separate case number to the appeal of each common factual or legal question and conduct further proceedings in the various appeals separately for each case" (emphasis added). The Board, however, did not, at any time throughout the appeals process bifurcate the alleged "multiple" issues into separate group appeals.

COMPLAINT FOR JUDICIAL REVIEW OF ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

38. Regulation 42 C.F.R. §412.106(b)(2)(i)(B), by which CMS includes in the Medicare Fraction days 'furnished to patients who during that month were entitled to both Medicare Part A (including Medicare Advantage (Part C)) and SSI, excluding those patients who received only State supplementation.'" It is uncontested that this regulation is the source of the Secretary's longstanding (since May 1986, 51 *Fed. Reg.* 16,772 ) policy of including only paid SSI days in the numerator of the Medicare Fraction, and it was disingenuous of the Board to claim that the Hospitals had not sufficiently identified the binding authority they were challenging. The Board was well aware of the challenged policy and the source of that policy. For example, the policy of including only paid SSI days in the numerator of the Medicare Fraction was discussed at length in the *Baystate Medical Center* four-day hearing before the PRRB, as well as in the subsequent litigation. *See Baystate Medical Center v. Leavitt*, 545 F. Supp. 2d 20, 28 (D.D.C. 2008), *amended in part*, 587 F. Supp. 2d 37 (D.D.C. Nov. 7, 2008), judgment entered, 587 F. Supp. 2d 44 (D.D.C. Dec. 8, 2008). Moreover, in response to the *Baystate* litigation, in the FY 2011 IPPS final rule, the Secretary changed certain aspects of its Medicare/SSI matching process with the Social Security Administration but reiterated its longstanding policy of including only paid SSI days in the numerator of the Medicare Fraction. *See* 75 *Fed. Reg*. at 50280-81. In November 2013, when several of the Group Appeals were filed, the Board had to be well aware of this policy and the 2011 IPPS final rule, to the extent and surprise that on or about July 11, 2018, the Board found it was not bound by the language in the 2010 final rule, solely because it found (incorrectly) that the policy expressed in the rule was not applicable to cost years prior to the 2010 final rule.

39. Throughout the Group Final Position Paper, it was abundantly clear that the subject group appeal does involve several of the Board's new rules, both Final as well as its frequently issued advisory opinions sent to all DSH health care providers that the group appeal did not involve multiple

legal issues, but rather the single legal issue of whether CMS's policy of including only "covered" days (i.e., days for which the patient was paid SSI) is invalid and identified regulation 412.106(b)(2) as the legal authority that the Providers were challenging. Plaintiffs are adamant that they believes there are multiple reasons or arguments as to why the policy and the regulation at issue are invalid, but this does not change the fact there is, but one legal issue involved in the EJR group appeal request. If the group appeal was properly filed and that EJR request was properly submitted, but should the Board disagree, it must, in accordance with section 405.1837(f)(2), assign separate case numbers to what the Board considers to be separate legal questions.

40. Whether the Board has jurisdiction in this case is a simple matter of knowing whether the appeal was filed timely and whether the amount in controversy was met. The Hospitals have satisfied both these requirements, as the Board well knows. As the record before the Board (specifically, the Model G, Statement of Providers for the group) shows, each Provider's request for a hearing was made within 180 days of receipt of the Provider's NPR, and the amount in controversy for the group was many times the statutory $50,000 minimum. The Board's various statements about not having "jurisdiction" over the alleged multiple issues is inaccurate and misleading. The regulations and Board rules (which are challenged here) prevent the Board considering more than one issue in a group appeal, but this is a matter of the Board's authority and manner in which to conduct a group appeal, and not a matter of "jurisdiction". The Board has jurisdiction over this group appeal.

41. The Board has never taken issue with the above-stated facts in the Model G, Statement of Providers for the group. The Board implicitly acknowledged that it had jurisdiction over the group appeal. The Board did not question whether it had jurisdiction or ask QRS to provide any information concerning jurisdiction other than what was already provided in the record but proceeded to require QRS to identify all regulations in which the Hospitals were challenging.

42. The statute provides that hospitals may obtain EJR if the Board *has* jurisdiction over their appeals (and the Board is without authority to decide a legal issue or issues) – it does not say that hospitals may obtain EJR only after the Board *determines* that it has jurisdiction. *See* 42 U.S.C. § 1395oo(f)(1) ("if a provider of services may obtain a hearing under subsection (a) and has filed a request for such a hearing, such provider may file a request for a determination by the Board of its authority to decide the question of law or regulations relevant to the matters in controversy"). Likewise, regulation 42 C.F.R. §405.1842(a)(1) states that "this section implements provisions in section 1878(f)(1) of the Act that give a provider the right to seek EJR of a legal question relevant to a specific matter at issue in a Board appeal *if there is Board jurisdiction to conduct a hearing on the matter*" (emphasis added). Certain regulations provide that a provider may not file a civil action unless and until the Board has *determined* that it has jurisdiction over the provider's appeal. *See, e.g.*, 42 C.F.R. §§405.1842(a)(4), 405.1842(g)(1)(v), 405.1842(g)(2), 405.1842(g)(3), 405.1877(a)(3). Such regulations, and any others that purport to prevent a provider from filing a civil action unless and until the Board has determined it has jurisdiction, are contrary to the plain language of the statute and internally inconsistent with regulation 42 C.F.R. §405.1842(a)(1).

43. Rule 8 of the PRRB Rules state that;

> Some issues may have multiple components. To comply with the requirements of 42 C.F.R. § 405.1835, appeal requests must specifically identify the items in dispute, and each contested component must be appealed as a separate issue and described as narrowly as possible using the applicable format outlined in Rule 7. Several examples are identified below, but these examples are not exhaustive lists of categories or issues.

Rule 8 A. lists nine non-exclusive "examples" of DSH sub-issues.

44. The PRRB's determination that no more than one "issue" can be presented in a group appeal is a final determination and is appealable to this court under 28 U.S.C. § 1331 under the exception in *Bowen v. Michigan Academy of Family Physicians*, 476 US 667 ((1986).

45. The PRRB's determination that the Hospitals appealed more than one "issue" in the group appeal and subsequent dismissal of the group appeal as constituting a "duplicate appeal" is a final determination and is appealable to this court under 28 U.S.C. § 1331 under the exception in *Bowen v. Michigan Academy of Family Physicians*, 476 US 667 ((1986).

## Count I

## Violation of Administrative Procedure Act

46. Plaintiffs incorporate by reference paragraphs 1. – 45 of this Complaint.

47. The APA provides that "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; [or] (E) unsupported by substantial evidence." 5 U.S.C. § 706(2).

48. The Secretary's regulation at 42 C.F.R. § 405.1837, requiring that group appeals contain only a single issue are contrary to the plain language of 42 U.S.C. §1395oo(b), and is arbitrary and capricious.

49. The Secretary's regulations that purport to prohibit a provider from seeking EJR before a court unless and until the Board has determined that it has jurisdiction over the provider's appeal are contrary to the plain language of the statute and internally inconsistent and arbitrary and capricious.

50. PRRB Rules 12 and 13 that require there be only one issue in a group appeal are contrary to the plain language of 42 U.S.C. §1395oo(b), are based on an invalid regulation, are arbitrary and capricious, and are procedurally invalid for failure to abide by notice and comment procedures of the APA, 5 U.S.C. § 553, and notice and comment procedures of 42 U.S.C. §1395h.

51. PRRB Rule 8, which divides an issue into subcomponents of an issue or sub-issues and considers arguments to be issues, for purposes of filing a group appeal is contrary to the plain language of 42 U.S.C. §1395oo(a), is arbitrary and capricious, and is procedurally invalid for failure to abide by notice and comment procedures of the APA, 5 U.S.C. § 553, and notice and comment procedures of 42 U.S.C. §1395h.

52. The PRRB's denial of EJR on the basis there were multiple issues in the EJR petition must be set aside because it was based on invalid rules.

53. The PRRB's finding that there were multiple issues in the EJR petition is arbitrary and capricious and not supported by substantial evidence.

54. The PRRB's various determinations over the course of the proceedings before it that the Hospitals did not renew its request for EJR, did submit a complete request for EJR, did not sufficiently identity the authority that was binding on the PRRB, and did submit a "standalone" request for EJR are arbitrary and capricious and not supported by substantial evidence.

55. The PRRB's failure to grant EJR on its own motion is arbitrary and capricious.

## Count II

### Mandamus

56. Plaintiffs exhausted their administrative remedies for purposes of mandamus jurisdiction and were owed the non-discretionary duty by the Secretary and the PRRB to issue regulations and instructions that are consistent with the Medicare Statute and apply such regulations and instructions in the adjudication of Plaintiffs' request for EJR.

57. The Secretary and the PRRB violated their non-discretionary duty by issuing and applying regulations and instructions that were inconsistent with the Medicare Statute.

58. Because the PRRB found that the group appeal involved more than one factual or legal question common to each provider, it had the nondiscretionary duty under regulation 42 C.F.R. 405.1837(f)(2)(ii) to "assign a separate case number to the appeal of each common factual or legal question and conduct further proceedings in the various appeals separately for each case." The PRRB failed to follow such requirements of such regulation.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an order:

1. Declaring invalid and vacating regulation 42 C.F.R. § 405.1837(a)(2) and (f), and any other regulation that requires group appeals to contain only one issue, and enjoining the Secretary from applying such regulations;

2. Declaring Provider Reimbursement Review Board Rules 8, 12 and 13 procedurally and/or substantively invalid and of no legal effect;

3. Reversing the PRRB's finding that the Hospitals did not file a complete request for EJR

4. Reversing the PRRB's denial of expedited judicial review (EJR) and remanding the matter to the PRRB for a new EJR decision within 30 days of the Court's remand order; or alternatively, should the Court find the denial of EJR was proper, remanding the matter to the PRRB with instructions to follow and implement the requirements of regulation 42 C.F.R. 405.1837(f)(2)(ii) within 30 days of the Court's remand order; and

/ / / /

/ / / /

/ / / /

5.  Awarding Plaintiffs costs and any and all such further relief as the Court may deem just and proper under the circumstances.

Dated: April 28, 2025

Respectfully submitted,

ALAN J. SEDLEY LAW CORPORATION

By: /s/ Alan J. Sedley
Alan J. Sedley, Esq. Bar# OH0017
18880 Douglas, Suite 417
Irvine, CA 92612
Phone: 818.601.0098

*Attorneys for Plaintiffs*